**In re PENN–DIXIE INDUSTRIES, INC., Debtor.**

**In re PENN–DIXIE STEEL CORPORATION, Debtor.**

**Bankruptcy No. 80 B 10472–73.**

United States Bankruptcy Court, S. D. New York.

March 12, 1982.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for debtors.

Stroock & Stroock & Lavan, New York City, for the Creditors' Committee of Penn-Dixie Steel Corp.

Sherman & Citron, New York City, for the Creditors' Committee of Penn-Dixie Industries, Inc.

Ballon, Stoll & Itzler, New York City, for the Committee of Equity Security Holders.

Surrey & Morse, New York City, for the Indenture Trustee.

Weber, Lipshie & Co., Accountant for Creditors' Committee in Penn-Dixie Industries, Inc.

J. Henry Schroder Bank & Trust Co., Indenture Trustee.

BURTON R. LIFLAND, Bankruptcy Judge.

On April 7, 1980, Penn-Dixie Industries, Inc. ("PDI"), a major national cement manufacturer, and Penn-Dixie Steel Corporation ("PDS"), a primary steel manufacturer and subsidiary of PDI, filed for reorganization under Chapter 11 of the Bankruptcy Code.[1] These cases are noteworthy in that they were among the largest (if not the largest) and most complex proceedings then filed under the Bankruptcy Code. The reorganizations have since successfully culminated in confirmation of integrated plans of reorganization. Effectively the recovery to creditors will be 100% in each case (95% cash on confirmation plus stock to unsecured creditors of PDI and 45% cash on confirmation plus stock to unsecured credi-

tors of PDS) with approximately $50,000,-000 and 5,000,000 shares of common stock to be immediately distributed. Another $15,-000,000 will be paid to creditors on a continuing basis. The debtors emerge as a single reorganized public corporation with its original stockholders maintaining a significant equity interest in what the evidence at the confirmation hearing demonstrates is a viable, stable, reorganized entity with meaningful value to stockholder interests both old and new. The surviving company, shorn of its pre-petition loss-producing operations, reenters the business community with respectable assets of approximately $100,000,000 under the more descriptive name of Continental Steel Corporation.

The unfolding of the proceedings witnessed elimination of approximately $60,-000,000 in liabilities attendant to a liquidation of PDS as well as elimination of other enormous potential liabilities that, by their nature, defy precise quantification absent ultimate judicial determination. Resolution of several significant matters among many highlight these pruning efforts. They include disposition of: (1) a major antitrust litigation with a minimum, potential liability of at least $7,000,000 based upon certain achieved settlements *pendente lite* (without consideration of damage trebling and speculative joint liability); (2) liability to the Pension Benefit Guarantee Corporation, with a potential priority claim in excess of $20,000,000; (3) filed claims deemed excessive by $12,000,000 over the debtors' acknowledged liability; (4) many other claims subjected to adversary suits, including substantial reclamation claims; and (5) resolution of an intricate controversy with the Internal Revenue Service, which resulted in an adjusted tax liability and deferral of tax payments and pension contributions, saving approximately $14,000,000 in cash payments over a two-year period. The latter arrangement was completed and recently approved by the Joint Committee on Taxation of Congress.

---

**1.** Title I of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, 92 Stat. 2549, enacted and codified as Title 11 of the United States Code the

"Bankruptcy Code" and all section references herein may be found in Title 11, unless otherwise indicated.

Other problems successfully and efficiently handled include the operation of PDI's antiquated, cash draining, cement division, pending its piecemeal liquidation and the concomitant problem of dealing with separate, large unionized work forces in both cases with accompanying crises of strikes and slowdowns. The latter problems in both cases were resolved through labor agreements permissive of the sale and termination of the cement business and strife-free operation of the steel plants, without significant residual labor claims against the estates.

Before the expiration of the second anniversary of the filing of the reorganization petitions, the distributions described hereinbefore will have been made to creditors and equity holders. There is no doubt that this swift reorganizational maturation is rare and may even be a record for a case of this type and magnitude. At the hearings on confirmation and allowances held on March 2, 1982, the representative of the Securities and Exchange Commission acknowledged that the expectation of administration of similar cases based upon the experience with other entities in Chapter X of the now repealed Bankruptcy Act of 1898, is five years. It is also clear from the court's almost daily involvement, that, but for the delayed resolution of one issue of post-confirmation financing, these cases were ripe for confirmation in the fall of 1981 within 18 months of their inception. This time compression is reflective of the intensity of the efforts exerted by all concerned.

Early in April and May of 1980, the potential for meaningful survival or cash recovery appeared slim. The secured lenders seeking resort to their collateral refused continued financial support. Moreover, the PDI debtor requiring bridge financing from its PDS subsidiary found dogged resistance from the PDS creditors. These creditors perceived this court's approval of intercompany advances to be to their irreversible prejudice and sought appellate review (later abandoned). In these early stages each estate's constituency jealously sought to preserve the integrity of its estate while pressing multi-million dollar claims against the other. The threatened dismemberment or liquidation of the companies at that time would have realistically resulted in liabilities in excess of $200,000,000 with minimal recovery to creditors and none to the public shareholders.

The early conflicts quickly gave way to earnest efforts pitched to an integrated reorganization. Based upon my observation and familiarity, I am of the opinion that the success of the proceedings were in large measure attributable to the high degree of professional skill and effective performances of each of the applicants herein. Myriad problems that were encountered were handled with a delicate sense of timing and adroitness which successfully eroded the implacability of the obstacles encountered.

Because the integrated reorganizations provide for compensation out of a single pool of available cash, and for the further reason that both cases proceeded in tandem, applications for allowances in both estates will be dealt with herein.

*Fried, Frank, Harris, Shriver & Jacobson,* counsel to PDI and PDS, seek total compensation of $3,007,144.92 and disbursements of $280,804.68 for a total of 26,713 hours expended. Against this total request, interim allowances of $1,472,824.28 and $185,345.13 in disbursements have been paid.[2] The final compensation request includes: $514,-983.14 held back by the court from the prior interim requests; time charges for the period July, 1981 through February, 1982 and lastly, an additional sum of $250,000 over and above the law firm's normal or lodestar time charges. The latter amount variously described as premium, bonus, reward or enhancement is sought on many alternatively advanced grounds: the extraordinary success achieved; the high quality of services rendered; recompense for the loss differen-

---

**2.** Pursuant to § 331 of the Bankruptcy Code, several professionals, upon application and after a hearing, were awarded interim compensa-

tion of amounts approximating 75% of their requests.

tial occasioned by delay or infrequency of payment (an interest carrying charge factor) and the expectation of premium compensation for major, intense matters successfully handled by the firm outside of bankruptcy proceedings.

In large measure the successes heretofore catalogued are the result of the skillful and effective performance of the law firm in handling the complex problems unceasingly encountered. Innovative techniques were developed and applied which eliminated an enormous quantity of claims litigation. Their commendable services characterized by deft use of personnel, were applied to the unusually broad spectrum of 'egal disciplines presented. These efforts were rewarded by salvage of a seriously ill enterprise.

I am not unmindful that the amount requested is large, as is the recoupment for creditors and equity holders. However, the creditors and shareholders are direct beneficiaries of the law firm's exemplary efforts and they have no cause for disapprobation. The impact on the beneficiaries is modest compared to their collective recovery. Therefore, as will be discussed further, the law firm's request for premium compensation will not be unheeded.

*Disbursements*: The law firm requests reimbursement of $280,804.68 for actual and necessary expenses. See § 330(a)(2) of the Code. While this court has no reason to question the amounts expended, it does discern a moderately liberal use of resources in the categories of secretarial overtime, travel expenses and duplication. I have therefore determined to reduce the amount awarded in this area by $25,000.

*Stroock & Stroock & Lavan*, counsel for the Creditors' Committee of PDS, seek total compensation of $269,970.50 and disbursements of $24,625.04 for a total of 1,957 hours expended. Interim allowances of $151,310.72 and $16,454.03 in disbursements have been paid. As with counsel for the debtor, this applicant's final request seeks approval of the amounts held back from interim grants and a premium of $25,000 in excess of regular time charges.

The services rendered by this firm were necessary and essential to the proceedings and the unsecured creditors of PDS. Their efforts and accomplishments are well documented in the several applications filed by them. While vigorously protecting the interests of their constituency, they nevertheless diligently and conscientiously worked toward a common reorganizational goal. I find their fee request fair and reasonable. *Sherman & Citron*, counsel for the creditors' committee of PDI, seek total compensation of $408,609.19 and disbursements of $9,659.04 for a total of 1,043 hours. Interim allowances of $90,011.45 and $8,093.86 in disbursements have been paid. This firm's final application also seeks payments of the amounts held back from interim grants and a premium of $250,000 in excess of their regular hourly time charges. As was the case with the other applicants, the firm's services were necessary, efficiently rendered and contributive to the excellent results obtained.

While an award of premium compensation is not inappropriate, the requested "bonus" of $250,000 sought herein is all out of proportion to the amount of time spent (1,043 hours yielding approximately $392 per hour), and the mission of the firm in these proceedings. To honor the request as made would indeed be countenancing profligacy. To the extent of its excessiveness, the bonus request will be disregarded.

*Ballon, Stoll & Itzler*, counsel for the committee of equity security holders of PDI, seek total compensation of $100,000 and disbursements of $550.44 for a total of 615.4 hours of involvement. Interim allowances of $34,422.50 have been paid. A premium of approximately $19,000 over regular time charges is included in the request. This firm's involvement in the case commenced in mid-November 1980 following court approval of their retention by the existing equity security holders' committee. Although they were not involved in the early stages of the cases, they quickly brought themselves up to speed and effectively performed their tasks in assisting the committee in the proper discharge of its functions

and responsibilities under and pursuant to the Bankruptcy Code. The amounts requested are fair and reasonable under all of the circumstances recounted.

*Surrey & Morse*, counsel for the Indenture Trustee, request total compensation of $164,463.70 and disbursements of $5,781.58 for a total of 1,661.6 hours. No interim allowances have been requested or paid. The law firm played a vital and highly visible role in the cases.

Although the Indenture Trustee was not appointed to either committee of unsecured creditors, it did, through its counsel, serve as an ex-officio member of the PDI Committee. Its active participation and contribution to the outcome of the cases is well · documented. The court is cognizant of the extent and value of the services and finds the amount requested reasonable and fully compensable. See §§ 503(b)(3)(D), (b)(4).

*J. Henry Schroder Bank and Trust Co.*, Indenture Trustee, seeks $13,077.64 as compensation for its services herein and $2,337.47 for disbursements. The services rendered herein have been documented and are payable (§ 503(b)(3)(D)) based upon substantial contribution to these cases as a party in interest pursuant to Section 1109(b) of the Bankruptcy Code.

*Weber, Lipshie & Co.*, accountants for the creditors' committee in PDI, seek compensation in the sum of $132,293.75 and disbursements of $13,811.16 for a total of 2,126.25 hours. Interim allowances of $87,-220.25 and disbursements of $11,813.03 have been paid. This applicant now seeks approval of amounts held back from interim grants. No premium in excess of regular hourly time charges is sought. A review of all of their applications indicates that applicant has had a substantial impact in the negotiations and formulation of the plan of reorganization and in providing essential · analysis in aid of the creditor committee watchdog functions over the continued operations of the debtors. The compensation requested is fair and reasonable.

## DISCUSSION

The relevant criteria for awarding attorney's fees was formerly governed by Bankruptcy Rule 219, which generally directed the courts to allow compensation giving "due consideration to the nature, extent, and value of the services rendered as well as to the conservation of the estate and the interests of creditors".[3] Thus an emphasis on principles of economy cut across all other considerations in formulating awards.

Fee awards are now governed by Section 330 of the Code which provides:

(a) After notice and a hearing, the court may award to the attorney for the debtor

(1) Reasonable compensation for actual, necessary services rendered based on time, nature, extent and value of such services *and the cost of comparable services other than in a case under this title*, and

(2) Reimbursement for actual, necessary expenses. (emphasis added)

This liberal standard of compensation marks a sharp cleavage from past practices which tended to preclude many highly qualified practitioners from entering the bankruptcy field. The rationale for the change is clearly set forth in the House Report on Section 330[4]: to encourage successful administration of estates by attracting bankruptcy specialists of high quality.

While the spirit of strict economy of the Bankruptcy Act of 1898 has been abandoned—in other respects prior case law still applies. Thus while authority for the so-called bankruptcy haircut has been eliminated, a tolerance for profligacy will not be countenanced. The criteria for fee awards variously stated contain three main elements: (1) the quantity factor: documented time spent and customary billing rates; (2) the quality factor: the quality of advocacy required and delivered, taking into account the novelty and difficulty of the

---

**3.** 3A Collier on Bankruptcy (14th ed.) ¶ 62.12(5) at 1483–91 (and cases cited therein).

**4.** H.R.Rep.No.595, 95th Cong., 1st Sess. 330 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

issues presented, skills called for, time constraints, and counsel's personal qualifications; (3) the result factor: the bottom line amount recovered for the estate and its creditors (as well as the degree of speed from loss to recovery). Buteneas, *Establishing Attorney's Fees Under the Bankruptcy Code*, 37 Business Lawyer 77 (1981). Consideration of these broadly stated fee formulation factors permits the court to focus on a firm's baseline time charges, and for cause, modestly enhance *or* sharply curtail them. In the instant cases, with one previously noted exception, the requested enhancements to the regular mixed hourly charges are modest. Analysis of the case law confirms that rigidity in the application of fee guidelines has never been the rule. Thus, courts have generally been free to ponder all the variables of a particular case and avoid ill-suited emphasis on a particular guideline.

Availability of bonus or enhancement compensation under the Bankruptcy Act is not unknown and has been recently reviewed in comprehensive fashion by my colleague, Judge Lewittes in *The Matter of Aminex Corp.*, 15 B.R. 356, 5 C.B.C.2d 155 (Bkrtcy., S.D.N.Y.1981). Thus premium compensation in an appropriate case was permitted even within the now eliminated "economy principle".

 Having previously noted the factors to be considered in granting compensation; the successful resolution of what may be considered a hard case; this court's appraisal of the services rendered based upon its own observations and, in applying all of the relevant criteria, applicants are awarded the following final allowances:

| Applicant | Final Allowance and Approved Disbursements | Interim Allowances and Disbursements already paid * |
|---|---|---|
| Fried, Frank, Harris, Shriver & Jacobson | $3,007,144.92 | $1,472,824.28 |
| disbursements | 255,804.68 | 185,345.13 |
| Stroock & Stroock & Lavan | $ 269,970.50 | $ 151,310.72 |
| disbursements | 24,625.04 | 16,454.03 |
| Sherman & Citron | $ 183,609.19 | $ 90,018.45 |
| disbursements | 9,659.04 | 8,093.86 |

| Applicant | Final Allowance and Approved Disbursements | Interim Allowances and Disbursements already paid * |
|---|---|---|
| Ballon, Stoll & Itzler | $ 100,000 | $ 34,422.50 |
| disbursements | 550.44 | |
| Surrey & Morse | $ 164,463.70 | none |
| disbursements | 5,781.58 | |
| J. Henry Schroder | $ 13,077.64 | none |
| disbursements | 2,337.47 | |
| Weber, Lipshie | $ 132,293.75 | $ 87,220.25 |
| disbursements | 13,811.16 | 11,813.03 |

* to be deducted from final allowance and approved disbursements.

SO ORDERED.