**In re ALLEGHENY INTERNATIONAL, INC., Sunbeam Corporation, Sunbeam Holdings, Inc., Almet/Lawnlite, Inc., and Chemetron Corporation, et al., Debtors.**

Bankruptcy No. 88–448 JLC.

Motion Nos. 91–1473M, 91–1574M, 91–1522M, 91–1523M, 91–1530M, 91–1531M, 91–2534M and 91–2898M.

United States Bankruptcy Court, W.D. Pennsylvania.

March 21, 1991.

On Motion to Alter or Amend, and Other Matters Aug. 16, 1991.

Lewis Davis, M. Bruce McCollough, George L. Cass, Buchanan Ingersoll, P.C., Pittsburgh, Pa., for debtors.

Cynthia Baker, Fried, Frank, Harris, Schriver & Jacobson, New York City, for Japonica/Sunbeam–Oster.

Michael Lederman, Sunbeam–Oster Co., Inc., Joseph A. Katarincic, Katarincic & Salmon, Dennis J. Lewis, Cohen & Grigsby, Pittsburgh, Pa., for Sunbeam–Oster.

Douglas A. Campbell, Campbell & Levine, Pittsburgh, Pa., for Sunbeam Unsecured.

Andrew J. Levander, Shereff, Friedman, Hoffman & Goodman, David M. LeMay, Hughes, Hubbard & Reed, New York City, for Japonica.

Robert G. Sable, Sable, Makoroff, Sherman & Gusky, Pittsburgh, Pa., for AI Unsecured Creditors.

Larry D. Henin, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for AI Equity Committee.

## MEMORANDUM OPINION

JOSEPH L. COSETTI, Bankruptcy Judge.

The matters presently before this Court are the fee petitions for final compensation of Buchanan Ingersoll, P.C., including the request for $2,700,000.00 in bonus compensation and the objections raised by the Reorganized Debtor.

Buchanan Ingersoll (hereinafter "BI") was hired by the Debtor and began work on the above-captioned case in February 1988. The initial review of all the fee petitions, including BI's fee petitions for the period from February 1988 to April 1989, resulted in a Memorandum Opinion and Order of Court dated December 14, 1989. The December 14, 1989 Opinion considered hourly rates extensively for this case. The Court limited BI's requested hourly rates and the hourly rates of other professionals. BI was ordered to recalculate its fee petitions and certify to the Court that the recalculation was consistent with the Memorandum Opinion. BI recalculated and certified the appropriate amount of money consistent with the Memorandum Opinion and the Court ordered such amounts to be paid.

Confirmation of the Debtor's Plan of Reorganization initially occurred on July 12, 1990. After certain parties appealed the confirmation, settlement negotiations initiated an amendment of the Plan which was finally confirmed on August 3, 1990.

On September 11, 1990, this Court again reviewed the fee petitions of all professionals including BI's fee petitions from the approximate period of May 1989 to April 1990. For the year commencing January 1, 1990 the Court allowed a 5% increase in all hourly rates as allowed in the December 14, 1989 Memorandum Opinion and Order of Court. Again, all professionals were ordered to recalculate the amounts pursuant to the December 14, 1989 Memorandum Opinion and Order of Court, as further modified by the Memorandum Opinion and Order of Court dated September 11, 1990. In September 1990, Samuel H. Iapalucci, certified that BI's fees and expenses were recalculated "in accordance with this Court's Order of September 11, 1990 as to hours and disbursements, *and with the terms of the Debtors' confirmed Plan as to applicable rates.*"

On August 7, 1990, BI requested of the Debtor, Allegheny International, the balance of fees due for the period of February 1988 through April 1989. This amount appears to represent the difference between the court-approved hourly rates and the hourly rates originally requested by BI. On August 8, 1990, the Debtors paid to BI the sum of $586,758.48. This payment was made without notice or approval of this Court.

On February 7, 1991, this Court reviewed the fee petitions of BI from May 1990 to September 1990 and ordered BI to recalculate those fee petitions "subject to the modifications in the Memorandum Opinion and Order of Court dated December 14, 1989, as further modified by the Memorandum Opinion and Order of Court dated September 11, 1990...." The Certification which was filed for the fee petitions from May 1990 to September 1990 states that the recalculation of fees was "computed in accordance with this Court's Order of February 7, 1991 as to hours and disbursements, *and with the terms of the Debtors confirmed Plan as applicable rates.*"

BI argues that Section 4.02 of the Plan provides for BI to be paid their contractual rates. Implied in this argument is an override of this Court's findings as to hourly rates to be charged for this case. Section 4.02 of the states:

Administrative Claims for fees and expenses of professionals retained by the Debtors, pursuant to Section 327 of the Code, shall be compensated at the higher of the contractual rates agreed to by the Debtors or such rates as the Court may allow.

BI argues that it had an agreement with the Debtor to be paid at the higher of the contractual rate agreed to by the Debtor or such rate as the Court may allow. This agreement about hourly rates was not presented to the Court nor is it alleged that such an agreement had been approved by this Court.

It is clear to the Court that this interpretation of Section 4.02 of the Plan must fail. No provision of a plan of reorganization can violate the clear statutory language of 11 U.S.C. Section 1129(a)(4). Bankruptcy Code section 1129(a)(4) specifically prevents the Court from approving a plan of reorganization unless all costs and expenses in connection with the case are subject to approval by the Court as being reasonable. The reason Congress has required this approval by the Court is to insure reasonableness, maximize the results for creditors and to prevent administrative creditors, who are granted priority, from overreaching.

Section 4.02 of the Debtor's Plan of Reorganization *cannot* negate either this Court's actual orders or a specific requirement of confirmation. This Court specifically ordered BI to recalculate its fee petitions in accordance with the December 14, 1989 Memorandum Opinion and Order of Court, as modified by the Memorandum Opinion and Order of Court dated September 11, 1990. The Order did not state that BI was to recalculate its fee petitions in accordance with the Debtor's Plan of Reorganization. The Court was not aware of the changed language used in the certifications submitted by BI.

Clearly the Debtor's payment to BI over the court-approved amount was not approved by this court and as carried out was not subject to court approval. If in fact there was an agreement between BI and the Debtor or the Reorganized Debtor, the Court did not approve such agreement, as it was required to do by the Bankruptcy Code. If the intention of the parties in drafting the language of Section 4.02 of the Plan of Reorganization was to avoid specific court orders to the contrary or to avoid review by the Court, then this Court should not have confirmed the Plan.

We need not revoke confirmation to correct this problem. However, in order to remedy this mistake, BI is to turn over the sum of $586,824.48 to the Clerk of the Bankruptcy Court. In addition, BI is to recalculate its fee petitions for the time period of *May 1989 through December 1990.* These recalculations are to include a summary sheet listing the hours for each attorney, his or her hourly rate, the fees charged for that attorney, and the amount allowed for each attorney by this Court's December 14, 1989 and September 11, 1990 Memorandum Opinions.

The Reorganized Debtor has alleged that BI has charged the Debtor's estate $35.00 per hour for "Project Assistants" and that these "Project Assistants" are in fact secretaries. If so, those requested expenses were disallowed in the December 14, 1989 Memorandum Opinion.

After recalculating the time period of *May 1989 through April 1990* BI is to turn over to the Clerk of the Bankruptcy Court all sums which were disallowed by this Court and were paid by the Debtor through the mistaken recalculation. These sums of money will be held by the Clerk of the Court until such time as the Court can determine the proper disposition of the funds.

The issue of whether BI is entitled to 2.7 million dollars in bonus compensation and what additional monies are to be paid on fee applications from May 1990 through December 1990 will be addressed when BI has filed the necessary corrections and re-

calculations as provided in this Memorandum Opinion.

■■■ This action has caused the Court to study 11 U.S.C. Section 1129(a)(4) and we conclude that the Reorganized Debtor is also subject to these same provisions of 11 U.S.C. Section 1129(a)(4). The language of that Bankruptcy Code section provides:

(a) The court shall confirm a plan only if all of the following requirements are met:

(4) Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

We interpret this provision to include professional costs and expenses incurred by Japonica beginning January 24, 1990, when it filed its Plan of Reorganization and continuing throughout the consummation of the Debtor's Plan and current activities related to closing the case. Therefore, the Court orders the Reorganized Debtor to account for any and all payments made to professionals in connection with this case which the Court has not approved as reasonable. The Reorganized Debtor may exclude professionals which were hired in the ordinary course and which the Court specifically allowed to be paid without filing a fee application. However, this Order specifically does include, but is not limited to, professionals such as Fried, Frank, Harris, Schriver & Jacobson; Katarincic & Salmon; Shereff, Friedman, Hoffman & Goodman; Hughes, Hubbard & Reed and various investment bankers, etc. . . .

Further, Mr. Samuel H. Iapalucci shall explain to the Court his failure to comply with the Orders of this Court under pain of contempt.

The integrity of this Court's Orders are at stake in this matter and the Court is offended by these actions. The United States Trustee is invited to participate in these matters.

## ON MOTION TO ALTER OR AMEND, AND OTHER MATTERS

The matters presently before this Court are the Motion of the United States Trustee to disgorge fees and impose sanctions upon Buchanan Ingersoll, P.C.; the fee petitions for final compensation of Buchanan Ingersoll, P.C., including the request for $2,700,-000.00 in bonus compensation; the objections raised by the Reorganized Debtor in regards to the bonus compensation; and Buchanan Ingersoll's Motion to Alter, Amend and Modify Judgment and to Reconsider the Memorandum Opinion and Order of March 21, 1991 as well as underlying interim orders of December 14, 1989, September 11, 1990 and March 28, 1991.

### I. Facts.

The Court does not commence this analysis on a clean slate. This case commenced in February 1988 and numerous matters have been adjudicated since that time. The initial review of all the fee petitions, including BI's fee petitions for the period from February 1988 to April 1989, resulted in a Memorandum Opinion and Order of Court dated December 14, 1989. The December 14, 1989 Opinion included an in camera review of AI's previous payments to BI for the year prior to the filing of the bankruptcy petition. The hourly rates which the Court allowed BI and others were substantially similar to the rates AI had previously paid prior to bankruptcy. This Court stated in the December 14, 1989 Memorandum Opinion that counsel "should expect to receive similar rates from a bankruptcy estate."

The Court's practice after reviewing fees was to order all professionals to recalculate their fee petitions and certify to the Court that the recalculation was consistent with the Memorandum Opinion. BI recalculated and certified the appropriate amount of money consistent with the Memorandum Opinion and the Court ordered such amounts to be paid.

Confirmation of the Debtor's Plan of Reorganization occurred on July 12, 1990. The litigation related to confirmation was

extensive. Various parties appealed, or threatened to appeal, the confirmation. Settlement negotiations sponsored by Japonica Partners were initiated and an amendment (or settlement) of the Plan was finally confirmed on August 3, 1990.

On September 11, 1990, this Court again reviewed the fee petitions of all professionals including BI's fee petitions from the approximate period of May 1989 to April 1990. For the year commencing January 1, 1990 the Court allowed a 5% increase in all hourly rates as allowed in the December 14, 1989 Memorandum Opinion and Order of Court. Again, professionals were ordered to recalculate the amounts pursuant to the December 14, 1989 Memorandum Opinion and Order of Court, as further modified by the Memorandum Opinion and Order of Court dated September 11, 1990. In September 1990, Samuel H. Iapalucci, certified that BI's fees and expenses were recalculated "in accordance with this Court's Order of September 11, 1990 as to hours and disbursements, *and with the terms of the Debtors' confirmed Plan as to applicable rates.*" The Reorganized Debtor has objected to this change.

On August 7, 1990, without Court order or approval, BI requested of the Debtor, Allegheny International, the balance of fees due for the period of February 1988 through April 1989. This amount appears to represent the difference between the court-approved hourly rates and the hourly rates originally requested by BI. On August 8, 1990, the Debtors paid to BI the sum of $586,758.48. This payment was made without notice to any party involved in the case. Court approval was not sought for this payment.

On February 7, 1991, this Court reviewed the fee petitions of BI from May 1990 to September 1990 and ordered BI to recalculate those fee petitions "subject to the modifications in the Memorandum Opinion and Order of Court dated December 14, 1989, as further modified by the Memorandum Opinion and Order of Court dated September 11, 1990 . . . ." The Certification which was filed for the fee petitions from May 1990 to September 1990 states that the recalculation of fees was "computed in accordance with this Court's Order of February 7, 1991 as to hours and disbursements, *and with the terms of the Debtors confirmed Plan as applicable rates.*"

BI argues that Section 4.02 of the Plan provides for BI to be paid their contractual rates. Implied in this argument is the concept that a Confirmed Plan can override this Court's findings as to hourly rates to be charged for this case and the resulting order. Section 4.02 of the states:

Administrative Claims for fees and expenses of professionals retained by the Debtors, pursuant to Section 327 of the Code, shall be compensated at the higher of the contractual rates agreed to by the Debtors or such rates as the Court may allow.

BI argues that it had an agreement with the Debtor to be paid at the higher of its contractual rate agreed to by the Debtor or such rate as the Court may allow. This alleged agreement was based on an alleged oral agreement.

This Court became aware of these events during a final fee hearing which was held on March 18, 1991. In response to this new information, this Court issued the March 21, 1991 Memorandum Opinion and Order of Court which instructed BI to turn over the August 8, 1990 payment to the Clerk of the Bankruptcy Court and to recalculate various fee applications which had been overpaid in the amount of $684,421.23. The Court has allowed additional time for the turnover of the payment until all matters involving BI's fees have been resolved by this Court.

In response to the March 21, 1991 Memorandum Opinion, the United States Trustee filed a Motion to Disgorge Fees and Impose Sanctions upon Buchanan Ingersoll for its violation of court orders.

*II. Buchanan Ingersoll's Motion to Alter, Amend and Modify Judgment.*

■ BI responded to the previous opinion by filing a Motion to Alter, Amend and Modify Judgment and to Reconsider the Memorandum Opinion and Order of March 21, 1991 as well as underlying Interim Or-

ders of December 14, 1989, September 11, 1990 and March 28, 1991.

The rates the Court found to be the costs of comparable services in non bankruptcy situations in Western Pennsylvania may not be the rates which are prevalent in other metropolitan areas or which may have become comparable nationally in large Chapter 11 cases. For example, through the proceedings the Court has learned that Japonica voluntarily paid higher rates to its professionals than this Court authorized for other professionals paid by the estate. Japonica hired these professionals initially as a creditor. Albeit for the purpose of taking control of the Debtor and for which it has been reimbursed by the Reorganized Debtor.

Buchanan Ingersoll now argues that all of the previous opinions should be reconsidered because of these new facts namely that Japonica voluntarily paid its attorney's higher rates and that these rates reflect the market rates. If BI had raised the evidence of Japonica's higher rates before it exercised self help, such evidence and argument would have had some merit. The Court is not suggesting that such evidence would establish the comparable rates. Actually the information was learned on the Court's own motion and was not raised until the Reorganized Debtor objected to BI's self help methods. BI's argument loses its power coming after the fact.

■ The Court observes that it is the hourly rates for professional fees associated with merger and acquisition and hostile takeover activities that are now being urged upon Bankruptcy Courts as the comparable market rate for professional fees in Chapter 11. The Court believes there are important differences between the two processes and that the professional fees obtained in mergers and acquisition and hostile takeover activities are not comparable for Chapter 11 cases.

The fees received by investment bankers and attorneys representing parties in merger and acquisition are frequently contingent upon the success of the acquisition. The investment bankers and attorneys in mergers and acquisitions are free to negotiate for themselves with their principals the amounts they will be paid. Their selection and participation in the engagement is not predicated upon their objectivity.

Chapter 11 proceedings are by definition judicial proceedings. The purpose of a Chapter 11 proceeding is to maximize the results for all creditors. Merger and acquisition proceedings are not judicial proceedings. Their purpose is to maximize the result for the movant. At best, the standard of ethics involved in the mergers and acquisitions process is the standard of the market place. However, that is not the standard expected of fiduciaries in the judicial process.

■ In the case of *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) the Supreme Court stated what the duties of a fiduciary are in a corporate situation. "He who in such a fiduciary position cannot serve himself first and his cestui second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty." *Id.* 60 S.Ct. at 247. The Supreme Court has also held that a trustee breached his fiduciary duties when he invested estate funds in an effort to create profit for himself. *Magruder v. Drury,* 235 U.S. 106, 35 S.Ct. 77, 59 L.Ed. 151 (1914). This Court has previously stated:

A fiduciary's dealings with those it represents are subject to rigorous scrutiny. Where any of its transactions are challenged, the burden is on the fiduciary not only to prove the good faith of the challenged transaction but also to show its inherent fairness from the viewpoint of those that the fiduciary represents. [citation omitted].

*In re Mesta Mach. Co.,* 67 B.R. 151 (Bkrtcy.W.D.Pa.1986). In the bankruptcy process the professionals are fiduciaries, not only to the parties they represent but also to the court. The professionals must be capable of proving that all actions taken are ethical and accomplished in good faith. Justice Cardozo stated that:

[m]any forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden by those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept a level higher than that trodden by the crowd.

*Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928).

In the mergers and acquisition/hostile takeover process, the payment of professionals is often contingent upon the success or result of the process. Payment in these situations is not necessarily related to professional competence or the services rendered but to brute financial power and the victory and, more importantly, the control which such power achieves. The new power base provides a ready source of payment for the fees. I believe the large fees associated with such activities may tend to cloud the judgment of such professionals. This Court would not find such activity fiduciary in nature. At best, it is the standard of the market place.

This situation should not become the standard in Chapter 11 proceedings. In Chapter 11, professionals are provided by statute with a administrative priority. This priority provides a distinct advantage over creditors. In return, Chapter 11 professionals are required to be objective in their dealings with all parties. The promise or agreement of a large fee would give the professional a private interest in the outcome of the case. Such agreement would prevent the a court from allowing that professional to participate in the process.

The Allegheny International case is frequently discussed on the lecture circuit as an example of a hostile takeover through the buying of claims and unfortunately as an example of what the future holds for Chapter 11. Earlier in this case the Debtors also proposed a plan and introduced investment bankers who attempted their own merger and acquisition strategy. In both the Debtor's and Japonica's merger and acquisition attempts, the Court observed that the ethics of the market place began to creep into the Chapter 11 process. This Court is compelled to maintain the fiduciary standards of a Chapter 11 proceeding. In keeping with those standards, professionals in a Chapter 11 are to be paid only in accordance with the Bankruptcy Code. 11 U.S.C. § 1129(a)(4).

Perhaps the hostility and free wheeling atmosphere which developed during the claims dispute or hostile takeover provided BI with reason to expect that Japonica would dispute its fees and delay payment. This fear may or may not have been justified. Evidently, BI believed it was compelled to negotiate with Japonica over its fees. BI believes that it had negotiated with the Debtor to receive the higher rates. Nevertheless, BI's self help cannot be permitted.

The Bankruptcy Code, specifically 11 U.S.C. Section 1129(a)(4), clearly requires that all fees be reasonable and that the Court make such a determination a condition of confirmation of the plan. The law is abundantly clear as to the Court's authority and duty to review fees. *See In re McDonald Bros. Const., Inc.,* 114 B.R. 989 (Bankr.N.D.Ill.1990) and *In re Chapel Gate Apartments, Ltd.,* 64 B.R. 569 (Bankr. N.D.Tex.1986). Nothing that has been submitted in the numerous briefs or in the arguments which cause the Court to change it's interpretation of Section 1129(a)(4).

BI maintains that the Court's lodestar amount was error and therefore all previous opinions should be reconsidered. BI argues that the proper lodestar is the applicant's normal billing rates. This Court follows the Supreme Court's definition of lodestar: "the number of hours reasonably expended on the litigation times a *reasonable hourly rate.*" *Blum v. Stenson,* 465

U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984) (emphasis added). In setting the rates the Court attempted to allow amounts similar to the rates the Debtor had previously paid to BI. The previous Memorandum Opinions and Orders of Court dated December 14, 1989, September 11, 1990, March 28, 1991, and March 21, 1991 are reaffirmed and now made final by this Memorandum Opinion and Orders of Court.

The Court does agree that until this final fee order is entered, the previous orders were interim orders and were not easily appealable. The entry of this Court's final fee orders provides an opportunity for such an appeal.

■■■ BI also argues that the Reorganized Debtor agreed in the settlement not to object to any fee applications. The Reorganized Debtor contends that this agreement not to object to fees only applied to those fees which were approved or allowed by this Court. The settlement clearly states that the Reorganized Debtor would not object to court approved or allowed fees. In any event, the Court cannot and is not bound by any agreement concerning fees by professionals or any other interested party.

### III. Buchanan Ingersoll's Fee Application For May to September 1990.

■■ BI has submitted a fee application for the months of May 1990 to September 1990. BI requests $1,248,553.00 in compensation and $115,341.92 in expenses. The Reorganized Debtor has recalculated the compensation request in accordance with the December 14, 1989 and September 11, 1990 Memorandum Opinions and Orders of Court. The Court allowed amount from May 1990 to September 1990 for compensation is $981,440.84 and for expenses is $115,341.92.

The Reorganized Debtor maintains that 75% of the requested fees and expenses were paid to BI for the period of May 1990 to September 1990. Therefore, BI is entitled to a credit in the amount of $160,-094.54.

However, BI must return to the Reorganized Debtor all amounts which were paid to BI in excess of the Court approved rates. The amount is as follows:

| | |
|---|---|
| 2/88–4/89 | $586,824.48 |
| 5/89–4/90 | $684,421.23 |
| 5/90–9/90 | (160,094.54) |
| Overpayment | $1,111,151.17 |

Buchanan Ingersoll is to pay this amount of overpayment to the Reorganized Debtor within twenty (20) days of this Memorandum Opinion and Order of Court. In addition, an appropriate member of the firm shall properly certify that this action has in fact taken place.

By letter, the Court requested that the Reorganized Debtor confirm the amounts of overpayment. In response, the Reorganized Debtor has alleged that BI is still holding an additional $500,000.00 which represents the retainer wired to it on February 18, 1988. This allegation was not included in previous pleadings, therefore, the record is not sufficient in the present action for the Court to make a determination with regards to this retainer.

### IV. Buchanan Ingersoll's Request For Bonus Compensation.

■■■ BI has requested $2,700,000.00 in bonus compensation. Bonus awards are only allowable in rare and exceptional cases. *In re Penn–Dixie Industries, Inc.*, 18 B.R. 834, 835 (S.D.N.Y.1982). BI provided services of high quality and the results achieved in this case were quite good considering the litigiousness of the case but the results were not rare or exceptional.

■■ Additionally, the Court should not grant bonus compensation to a professional who violated this Court's specific Orders regarding fees. The self help initiated by BI is cause enough to deny any bonus compensation.

### V. Japonica's Fees.

■■ Upon the Court's own motion, and in accordance with the March 21, 1991 Memorandum Opinion and Order of Court, we find that Japonica must also observe 11 U.S.C. Section 1129(a)(4). Initially, Japoni-

ca hired its professionals as a creditor and privately agreed to compensate those professionals for the work they accomplished. The Court is not required to approve the retention or review the fee applications of a creditor's professionals.

However, Section 1129(a)(4) does apply to the payments which Japonica requested and received from the Reorganized Debtor in order to reimburse themselves for their expenses and professional fees. Japonica has not requested approval of these payments. Again, Japonica asks this Court to apply the standard of the market place. Although the rules of the market place may again apply post-bankruptcy, Japonica cannot receive its expenses for work performed prior to the consummation without an application and approval from the Court. Japonica received the Reorganized Debtor's approval of these fees immediately upon consummation of the Plan of Reorganization. The timing of this act and the type of expenses and services paid removes it from a post-bankruptcy activity. Court approval was not requested.

The Reorganized Debtor suggests that it is pointless to require Japonica to return the money because the Reorganized Debtor can accomplish the same act through a dividend. Perhaps this is so, however, all shareholders would be entitled to such a dividend. There are a few minority shareholders who would entitled to that dividend. There are also corporate requirements and tax implications which would result from a declaration of such a dividend. The Court is not approving nor denying the issuance of such a dividend, however the payment to Japonica which attempted to reimburse it for its expenses is not permitted under 11 U.S.C. Section 1129(a)(4).

Japonica argues further that the independent directors made the determination to reimburse Japonica. However, the fact that this approval occurred on the very day of consummation when the Reorganized Debtor had no corporate history clearly shows that this was a payment made for services and costs to reimburse Japonica and its professionals in connection with the

case without court approval. "Independent" directors of a reorganized debtor have no authority to violate 11 U.S.C. Section 1129(a)(4).

Additionally and as a minimum, disclosure of Japonica's intent to do this act should have been made at the time of the requested amendment of the July 12, 1990 Confirmation Order. Even so, disclosure would not preclude this Court from determining the reasonableness of the Japonica fee request. Japonica is to return all the money it received for its reimbursement of professional fees and its related investment banking fees to the Reorganized Debtor.

*VI. The United States Trustee's Motion For Sanctions.*

The United States Trustee has been faithful to the role Congress anticipated when it created the office and should be commended.

The posture of the case makes meaningful sanctions difficult. The Court has given the appropriate sanctions a great deal of thought. In a Chapter 7 proceeding, a second distribution to creditors in order of priority would have been an appropriate sanction. Such a sanction would have benefitted creditors for whom both Japonica and BI were acting as fiduciaries.

Under the confirmed plan, creditors bargained for $7.00 per share and allowed creditors have received that bargain. Perhaps if creditors had the additional information they might have bargained for more. However, further distribution of these recovered fees would raise several problems in a consummated Chapter 11 case.

Therefore, as a remedy for the self help action taken by Buchanan Ingersoll and the violation of specific orders of this Court, a sanction of $10,000.00 is ordered to be paid by Buchanan Ingersoll to the Clerk of the United States Bankruptcy Court for the Western District of Pennsylvania within twenty (20) days of this Memorandum Opinion and Order of Court.

Japonica is also sanctioned and ordered to pay $5,000.00 to the Clerk of the United

States Bankruptcy Court for the Western District of Pennsylvania within twenty (20) days of this Memorandum Opinion and Order of Court for failure to request approval of the of the fees paid by the Reorganized Debtor in accordance with 11 U.S.C. Section 1129(a)(4).