**In re Walter Clayton MULLINS
t/a Jill Mining Co., Debtor.**

**Bankruptcy No. 7–80–00727–HPA–11.**

United States Bankruptcy Court,
W.D. Virginia,
Abingdon Division.

Sept. 7, 1995.

John M. Lamie, Abingdon, Virginia, for debtor.

Daniel K. Read, Jessee & Read, Abingdon, Virginia, for heirs of debtor.

Jo S. Widener, Bristol, Virginia, for Estate of James E. Nunley.

Robert T. Copeland, Copeland, Molinary & Bieger, Abingdon, Virginia, Disbursing Agent/Escrow Agent.

## MEMORANDUM OPINION

H. CLYDE PEARSON, Bankruptcy Judge.

Before the Court is the Application under Rule 2016 for attorney's fees of the Estate of James E. Nunley, Deceased, who was the Debtor's original counsel in this case. The Application seeks compensation in the sum of $50,000.00. Due to the fact that counsel is now deceased, the Court considers it necessary to carefully review the Application and the entire file herein; that, having done so, the Court concludes that the fee requested should be enhanced. In view of the standards outlined by the Fourth Circuit Court of Appeals, hereafter, it is clearly necessary to review the file and elicit therefrom and recite facts surrounding this attorney's services rendered and his standing and ability in the field of bankruptcy law, as well as other areas of the law in which he practiced, in determining a reasonable fee.

A general overview of the case is essential and necessary for proper resolution of the merits in fixing a reasonable fee.

A brief history is as follows:

This Chapter 11 petition was filed in this Court by Mr. Nunley over 15 years ago on June 27, 1980 and has remained open since its filing. It began when Walter Clayton Mullins, the Debtor, who, also, is now deceased, came to Mr. Nunley's law office in Bristol, Virginia, seeking legal representation, assistance and guidance. This attorney, apparently, had been highly recommended by persons in the area familiar with his professional standing, ability, and practice. Seated across the desk from Mr. Nunley was a physically and financially broken coal miner who had lost all of his worldly goods except a heavily mortgaged home, upon which were Internal Revenue Service ("IRS") and judg-

ment liens. In fact, the IRS was threatening to seize and sell the home in satisfaction of delinquent tax liabilities. The Debtor may also have owned a couple of old motor vehicles and a questionable interest in a cause of action arising out of his mine operations in the coal fields of Southeastern Kentucky against a subsidiary of Bethlehem Steel Corporation ("Bethlehem").

Mr. Mullins' apparent review of the facts was to the effect that Bethlehem had trespassed upon and, apparently, taken over the land leased to Mr. Mullins from lessor—one Mr. Johnson. Not only had Bethlehem taken over the land but had, in effect, destroyed the coal operation and the property of Mr. Mullins, leaving him and his partner with approximately one-half million dollars in debts and no income or other property except the heavily mortgaged home and the few items of personal property.

A review of the file and the schedules filed with Debtor's petition reflects that his financial condition was such that he had no funds with which to pay or advance toward Mr. Nunley's fee. The schedules reflect that the parties agreed that Mr. Nunley would be paid, at some point in time, the sum of $500.00 and, in addition, would receive "a surcharge for favorable results." This Court construes the language as creating a contingent fee arrangement for any successful recovery that might be forthcoming in processing this Chapter 11 case and litigation of Mr. Mullins and the landlord against Bethlehem Steel in the state courts of Kentucky.

The history of this case is extensive. It has been pending in this Court for these many years, due in large measure to the diligence and urging by Mr. Nunley in his appearances before this Court that this case, for the benefit of the Debtor and creditors, should continue on the court docket. Its remaining on the docket has also, in no small measure, been due to the patience of this Court, which, over the years has declined to adopt the practice that the closing of the cases is the most important aspect of the work of this Court. It is a case that began as a dismal and hopeless undertaking to a highly successful conclusion. Its history and conclusion was sufficiently dramatic that it merited the attention of *The Wall Street Journal* and was reported as a front-page story in the March 23, 1995 issue. See attached Appendix "A."

In further reviewing the facts and circumstances concerning the fixing of a reasonable fee, it appears necessary in the evaluation of this attorney's service, in which no fee has ever been paid even to this date, that Mr. Nunley, himself, while setting his usual example to all members of the legal profession, personally related to Mr. Mullins' dilemma while seated across his desk.

This Debtor, apparently, was a person, who like himself, was the product of being born and reared in a small mining town in Letcher County, in the coal fields of Southeastern Kentucky. There, he and other members of his family were fed, clothed and supported by the sweat of a coal miner's brow. This was fortunate for Mr. Mullins because he had consulted an attorney to handle his case who would do so with every ounce and particle of his ability without demanding an up-front fee that his client could not pay. Obviously, this was because of his great concern for the financial circumstances of his client and the fact that he, himself, could relate to his client's financial problems.

His professionalism was imbedded further in his practice because he had risen from obscurity to the position of prominence in the legal profession.

When Mr. Nunley reached the enlistment age during World War II, he emerged from the coal fields and entered the service of his country as a member of the United States Marine Corps and served with great honor and distinction during that War. Upon his honorable discharge, he decided his future course would be to serve his fellow man in the legal profession; and by virtue of the available financial assistance of the GI Bill that provided educational benefits to discharged veterans, he proceeded to do so.

Following his pre-law studies, he entered the University of Richmond Law School where he graduated and was admitted to the Bar of Virginia. While enrolled, he served in various positions of leadership in the law school. Upon graduation, he established a

solo practice in the City of Bristol, Virginia. There, he distinguished himself not only in the field of the general practice of law and as a substitute judge, but became known throughout the area as an able attorney. He was known among the legal profession, and the public generally, as one of the premier bankruptcy practitioners in the State of Virginia. As in law school, in the beginning of his practice he worked part time at night to support his young family while establishing his practice during the day.

In reviewing Mr. Mullins' case and deciding what approach to take, Mr. Nunley's legal skills, ability, and wisdom were very apparent. Although Mr. Mullins was an individual and had been doing business in the name of Jill Mining Company, it was apparent to Mr. Nunley that a Chapter 11 case was the appropriate and necessary approach, under the facts and circumstances, in order to propose a Plan to the creditors. In those days a Chapter 11 case was foreign terminology to most members of the bar of this State. A Chapter 11 would preserve the ongoing litigation and permit Mr. Mullins and the other parties to pursue the same in the State Courts of Kentucky in the hopes of a recovery. If recovery was successful, this would enable the creditors in this case to be paid, which, otherwise, would receive nothing in a Chapter 7 liquidation. The Chapter 11 case would permit Mr. Mullins to pursue and maintain control of the litigation in Kentucky in a manner that would ultimately prove successful and beneficial to all creditors.

The litigation in Kentucky proceeded over the period of approximately 15 years moving through the state and, indeed, the federal courts of Kentucky and, ultimately, to the Supreme Court of the United States. The final decision resulted in a recovery by all parties, including this Debtor, from Bethlehem Steel Corporation of approximately 40 million dollars. Mr. Mullins' estate recovered approximately 2 million dollars as his portion.

It appears further from a review of the file of this case that the proposed Plan, decided upon and prepared by Mr. Nunley, provided for the payment of all creditors in full of the principal amount of their claim without interest. The fact that Mr. Nunley agreed to take the case under a contingent fee arrangement, depending upon the outcome and success of the litigation in Kentucky, permitted the case to go forward to a successful conclusion. The creditors in this case, whose claims have been filed and allowed, have now been paid 100 percent of all their claims, which totaled in excess of $200,000.00.

The Plan which Mr. Nunley proposed, and was accepted and approved by the creditors and confirmed by order of this Court, provided for payment of 100 percent, but, as heretofore stated, did not provide for interest on the claims. Mr. Nunley could foresee that the litigation in Kentucky could be protracted and of long endurance. This provision alone has benefited the estate of the Debtor herein and the heirs and beneficiaries of Mr. Mullins' estate to the extent of approximately $300,000.00, in addition to the original surplus funds. This, of course, was fair and accepted and agreed to by the creditors, which at the time, obviously, realized that they would receive nothing unless there was a recovery from the litigation. The Plan was confirmed.

A review of the file further reflects that Mr. Nunley, on numerous occasions, appeared in this Court and, apparently, in the Kentucky courts in connection with this case from the date it was filed in 1980 until his untimely death in 1986. He, obviously, spent untold hours in connection therewith. For a period of six years, he shepherded the case in this Court by frequent appearances, persuading this Court that it was necessary for the benefit of the Debtor and the creditors that the case remain open, and would regularly update the Court on the progress of the Kentucky litigation. He usually appeared with competence and composure in representing his client and persuaded the Court to keep the case on the docket. In all of these matters, his position was sound and correct throughout. The success of the case in this Court and, indeed, in the Kentucky litigation, was due in large measure to the knowledge and ability that this attorney possessed in the applicable bankruptcy laws and his efforts and ability to pursue the Chapter 11 case in the manner in which he did, enabling

Mr. Mullins' cause of action to go forward, ultimately, to a successful conclusion, paying creditors in full on all their claims.

A review of the case file further reflects that Mr. Nunley was in court frequently. Many appearances related to secured creditors' efforts to foreclose upon the residence as well as many other motions and proceedings. The file is replete with copies of communication and letters from creditors, attorneys, and other parties to Mr. Nunley, which had to be responded to and dealt with, requiring many hours of his time and attention. He filed numerous motions and pleadings over the six-year period dealing with various phases of the case. At one time it was converted to Chapter 13 and later reconverted to Chapter 11.

A recitation of the foregoing facts and circumstances is necessary under the special facts and circumstances of this application in consideration of fixing a reasonable fee for this attorney.

■ The law applicable to fixing attorneys' fees is generally viewed and considered in light of the Fourth Circuit Court of Appeals' decision in *Barber v. Kimbrell's, Inc.,* 577 F.2d 216 (1978) at 226, where the Fourth Circuit adopted the standard of the Fifth Circuit in the case of *Johnson v. Georgia Highway Express,* 488 F.2d 714 (1974). The opinion adopts a 12–point standard for fixing fees as set forth therein. The court stated:

It is well established that the allowance of attorneys' fees " 'is within the judicial discretion of the trial judge, who has close and intimate knowledge of the efforts expended and the value of the services rendered. And an appellate court is not warranted in overturning the trial court's judgment unless under all of the facts and circumstances it is clearly wrong.' " *Lea v. Cone Mills Corp.,* 467 F.2d 277, 279 (4 Cir.1972), *quoting United States v. Anglin & Stevenson,* 145 F.2d 622, 630 (10 Cir. 1944) *cert. denied,* 324 U.S. 844, 65 S.Ct. 678, 89 L.Ed. 1405 [ (1945) ]. Yet, as this statement clearly implies, appellate review, while necessarily limited in scope, is nonetheless available to insure that the trial court's discretion has not been abused. We cannot afford effective appellate review unless we have before us the district court's reasons for finding a particular award appropriate.

■ The *Johnson* citation in the *Barber v. Kimbrell's, Inc.* case includes the 12 elements to be considered as follows:

These include: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney's fees awards in similar cases.

■ In addition to the 12 elements that are considered in arriving at a reasonable fee in this case, the most significant element here is No. (8), which notes the amount in controversy and, more importantly, the results obtained. In *Barber v. Kimbrell's, Inc.,* the district court had, in fact, enhanced the fee of the attorneys in that case, which was then before the Fourth Circuit. The case law is replete with decisions where courts have felt compelled to enhance the fee for the meritorious services rendered by counsel in the case.

The following are various cases which have allowed the Court to enhance fees due to the facts and circumstances of the case: *Johnson v. Georgia Highway Express,* 488 F.2d 714 (1974); *Barber v. Kimbrell's,* 577 F.2d 216 (4th Cir.1978); *In re Warrior Drilling, Inc.,* 9 B.R. 841 (Bankr.N.D.Ala.1981); *In re McLean,* 6 B.R. 327 (Bankr.E.D.Va.1980); *In re Penn–Dixie Industries,* 18 B.R. 834 (Bankr. S.D.N.Y.1982); *In re KDT,* Nos. 82–B–11453/515 (Bankr.S.D.N.Y.1984) *cited* in 2 Collier ¶ 330.05.

In *Penn–Dixie,* the Court allowed compensation substantially in excess of usual

charges based upon the excellent results achieved following the Chapter 11 successful reorganization. The Court stated that 11 U.S.C. § 330 had made the issue of economy in fixing fees inapplicable.

In the case of *KDT*, the Court increased and enhanced the fee award by $100,000.00 from the requested amount of $575,000.00 because the trial court found that counsel for the creditors to be "a critical element of the successful negotiation of a consensual Plan of Reorganization."

A brief analysis of the 12 factors, as they relate to the facts here, clearly reveals that fee enhancement is appropriate in this case. The time and labor expended was substantial and continuous for the period of six years from 1980 until Mr. Nunley's death in 1986. This case is rare indeed as to the novelty and difficulty of questions raised and dealt with. Without the able representation of this counsel, the creditors and Debtor would have suffered irreparably. The skill and ability demonstrated by Mr. Nunley in this case is rare indeed. He devoted undue hours to the case without any compensation or payment upon his fee, with only the expectation and apparent confidence he had in the ultimate recovery. His assessment of the Kentucky litigation's success was obviously 100 percent accurate as history and hindsight has now shown. The result obtained was extraordinary and was beyond anyone's expectation when begun. The capable legal ability of Mr. Nunley and, certainly, the attorneys handling the litigation in Kentucky, obviously, convinced him that the claim of his client was meritorious and worthy of his efforts and undivided attention.

As heretofore stated, the Application herein requests a fee of $50,000.00 to Mr. Nunley's Estate and was submitted by counsel who, apparently, did not have the benefit of or an opportunity to fully review the court file in this case. This Court has reviewed in detail the entire court file in order to fix a proper and reasonable fee. This Court, from such review, has concluded that, without question, the success of this case for the benefit of the Debtor and creditors, with creditors receiving payment in full of their claims, was the direct result of Mr. Nunley's efforts. The Plan—which was prepared, presented, approved and confirmed—permitted the litigation to successfully go forward in Kentucky, thereby enabling all creditors of Mr. Mullins to be paid in full. After payment of all creditors' claims and administrative expenses, the personal estate of Mr. Mullins will realize approximately 1.5 million dollars.

Accordingly, it is the opinion and conclusion of the Court, after careful review of all the facts, that a reasonable fee due Mr. Nunley's estate, under the facts, circumstances, and authorities herein, is the sum of $100,000.00, which is only a small percentage of the amount recovered for the estate herein, and which is fair and equitable and, without question, earned in large measure, due to the distinguished service that Mr. Nunley rendered to his client in this case. An appropriate Order will be entered.

## APPENDIX A

VOL. CCXXV NO. 57

# Kentucky Wonder

## How the Fur Flew Over a Mining Claim, But Lawsuits Crawled

### A 30-Year Struggle Seems To Favor a Mountaineer, Making His Heirs Rich

### Bethlehem Steel's Last Stand

By VIVECA NOVAK
*Staff Reporter of* THE WALL STREET JOURNAL.

PIKEVILLE, Ky. — In 1964, John Johnson, a curmudgeonly mountaineer and sometime moonshiner, confronted a crew of coal-company surveyors on his land. Brandishing a shotgun for emphasis, he drove them off.

The surveyors worked for a subsidiary of Bethlehem Steel Corp., and the company pulled out a big gun of its own. Using a series of lawyers, it laid veritable legal siege to Mr. Johnson's land, a craggy spread lying smack in the heart of Hatfield and McCoy country. Bethlehem claimed that an arcane web of property transfers gave it the rights to hundreds of thousands of tons of prime coal under Mr. Johnson's property.

Mr. Johnson had another notion: The Fortune-500 company, he reckoned, was trying to steal him blind.

### Fight to the Finish

Thirty years later, Mr. Johnson lies long dead and buried in a family plot at Three Mile Creek near here, but the case, like some half-dead survivor of a backwoods shootout, lives on. Bethlehem Steel says that today it will ask the U.S. Supreme Court to overturn a ruling by the Kentucky Supreme Court — a ruling preceded by hearings or decisions before nearly a score of other judges.

The company's tenacity in this latest instance might be understandable: Last year, the Kentucky high court — for the second time — affirmed a damage award of almost $40 million to Mr. Johnson's heirs and certain other litigants. Furthermore, the courts' rulings confirmed the mountaineer's suspicions: that Bethlehem subsidiaries, BethEnergy Mines Inc. and its predecessors, willfully trespassed on his property and had lied and lawyered their way into literally stealing 625,000 tons of his coal.

But numerous adverse findings over the decades never slackened Bethlehem's litigious zeal. It has rebuffed all efforts to settle the case, and it has fought fiercely

every call against it, even to the point of individually suing Kentucky's Supreme Court justices. Two months ago, bowing to the latest blast from the Kentucky Supreme Court, the company reluctantly sent representatives to Pike County to deliver a check to be distributed to the litigants—money that ostensibly could be recovered should Bethlehem win its last-ditch Supreme Court appeal. Molly Thornbury, one of Mr. Johnson's daughters, now has a new white Monte Carlo parked incongruously in front of her rusting trailer; she plans to build a new house.

"We had to keep fighting," says Claude Johnson, at 51 the youngest of Mr. Johnson's nine children, who each got just shy of $1 million out of the case. Adds Gilbert Davis, a Fairfax, Va., lawyer who represents Church & Mullins Corp., a small mining concern that joined the suit: "This case has had a life of its own."

### Big Money, Bad Blood

This case, in a way, is an elongated metaphor for the fortunes of Pike County, a mountainous, impoverished wedge of Kentucky where desolately beautiful moonshine hollows snake among ruined hillsides gouged by mining. In the late 1800s,

the county was the epicenter of America's best-known family feud—the Hatfields and McCoys. But early in this century, its rich veins of coal stirred new blood feuds as out-of-state business interests stripped the land above and below.

A common tactic of the big-money outlanders was to file claims for land where ownership was ill documented, and then use their high-priced lawyers and deep pockets to litigate the issue to death. The hardscrabble highlanders, most of them dirt poor and illiterate, almost always lost.

This case, like so many others, came down to "these relatively modest people against one of the biggest corporations [operating] in Kentucky," said former Pike County Judge Will T. Scott, who made the original rulings in the litigation and is now a candidate for state attorney general. "Bethlehem doesn't lose many cases."

Bethlehem, in a prepared statement, says only that it "continues to believe that the decision of the Kentucky Supreme Court is erroneous" in finding that it had willfully trespassed on Mr. Johnson's property while illegally mining his coal.

Back in 1964, Bethlehem Steel, given the region's history, might have had reason to be cocky. But Mr. Johnson turned out to be the wrong guy to pick on, poor
*Please Turn to Page A4, Column 3*

*Continued From First Page*

though he was. He lived on several hundred acres of inhospitable, rocky terrain along Three Mile Creek and Kate's Hollow, where he plucked his banjo and scratched out a living growing scraggly crops and, when need be, distilling corn liquor. There were lots of mouths to feed, and Johnson relatives recall years when the family got its clothes at "ragshakes" — bundles of castoffs left by missionaries—and much of its food from government-surplus bins.

But those who knew Mr. Johnson describe him as tough, wiry and bulldog tenacious. Whatever material possessions he lacked, he had a dead-certain belief that coal-company surveyors who appeared on his land one day, claiming the right to survey it, had no business there. He shooed them off in a hurry.

Bethlehem, saying it could trace its claim to the mineral rights under his land to a Johnson relative, sued Mr. Johnson in Pike County Circuit Court, essentially seeking an injunction preventing him from interfering with the surveyors. Mr. Johnson sued back, but the court granted the injunction anyway. The judge cited a pledge by Bethlehem that it only wanted to survey for now, not dig out the minerals. The question of ownership was still pending.

The coal at issue was high-quality, low-sulfur stuff from a seam known as Elkhorn No. 2. Elsewhere along the same seam, Bethlehem was already extracting the coal, which was great for steelmaking, but its tunneling hadn't yet reached the disputed property.

### Stirring the Fires

For five years, the case lay dormant. Then in 1970, Mr. Johnson lit a fire under it by letting Walter Mullins, a coal operator, and Mr. Mullins's brother-in-law, Dexter Church, a Free Will Baptist preacher with an entrepreneurial streak, open a small mine on the property. Bethlehem raced to court and got a temporary injunction to stop them. Maps filed by Bethlehem in 1971 indicated the company hadn't begun to mine any of the disputed coal — an assertion that would later be proved untrue.

But after that spurt of activity, the sluggish wheels of justice ground to a halt. One judge recused himself after Church & Mullins accused him of bias. Another held the case file for three years and died. Finally in 1979, eight years after the original injunction was granted, a trial to decide ownership began.

Bethlehem in essence told Judge Reed Anderson that it could trace its mineral claims in a continuous sequence back to one Denny Vanover, who deeded them away in 1890. Mr. Johnson, though, claimed that Mr. Vanover, an uncle of his who had spent half his life in prison, only owned 100 acres of the mineral rights he had deeded away. Those mineral rights belonged to Bethlehem, Mr. Johnson conceded. But he told the court that he had lived on and worked the land since 1918, and the rest of it — about 275 acres in all — belonged to him "from heaven to hell," as an old maxim in state law put it.

## Records of Confusion

It wasn't all that simple, of course; both sides were trying to prove their claims through byrinthine chains of often poorly documented ownership. They argued about things like whether an 1865 survey, known as the Gallop & Sowards — more familiarly, Galloping Swords — included the land in question. Lawyers for Mr. Johnson's side recall hours spent poring over aged, ambiguous title records signed with "X's" by little-educated property owners. Descriptions often read like this: "Beginning on a beech on left fork of said creek above Kates Hollow; thence across the branch and up the hill to a maple on the hill; thence to a black jack on a point; thence to a small black pine on the point."

The trial ended in 1981. Months went by with no decision, then years. The case had become part of an immense backlog in Pike County Circuit Court; a factor contributing to the defeat of Judge Anderson, who had tried the title dispute, at the polls in 1983.

His successor, Judge Scott, slogged through thousands of backed-up cases. Finally, in September 1986 — after taking the voluminous case record with him on vacation — he issued the long-awaited ruling: Bethlehem had the mineral rights to the 100-acre parcel that Mr. Johnson didn't contest, plus another 64-acre tract. The remaining 211 acres were Mr. Johnson's — from heaven to hell.

Mr. Johnson, for whom the case had become an obsession, didn't live to hear this; he had died two years earlier, just before his 97th birthday. But his eight offspring remained in the case.

## Matters of Degree

Next was the all-important hearing to determine what Bethlehem owed in damages. The Church & Mullins lawyers came armed with some explosive evidence: one was a 1975 deposition from Louis Quick, an engineer for Bethlehem's mining unit, who admitted that Bethlehem had already begun to mine the coal in question — despite its assurances to the court to the contrary. Indeed, just after Judge Scott ruled in the Johnson's favor, the Johnson lawyers obtained evidence that the company had already removed 60% of the coal in question by 1975. Furthermore, the map that the company had filed with the court in 1971 in which it declared it had done no mining was a flat-out lie.

Judge Scott made his decision on damages in February 1987, excoriating the company for its "callous and reckless disregard for the property rights of the defendants." He also castigated the company for its long chain of deceit over its no-mining claims, accusing Mr. Quick, in his decision, of a "cavalier attitude toward the truth." He ordered Bethlehem to pay $16.9 million in damages, ruling that the company's actions were willful rather than innocent. As important as the millions was the precedent: No Kentucky title dispute had ever resulted in a willful-trespass ruling.

This was bad news at a bad time for Bethlehem. Imports and minimills were draining its business, and its unfunded pension liabilities were mounting. In 1987, the company had explored seeking bankruptcy protection from its creditors, an action several major steelmakers had already taken.

Not unexpectedly, it fought both the title and damages rulings in an appeal to the Commonwealth of Kentucky Court of Appeals. While the appeals court ruled that Judge Scott hadn't erred in his title decision, it bought Bethlehem's argument that the company hadn't acted willfully, and rejected some of Judge Scott's findings about Bethlehem's conduct.

Both sides promptly appealed to the Kentucky Supreme Court, which agreed to hear the case in September 1991. By the time the case file arrived, it was so thick that one justice, at oral arguments, said he assumed the court had been asked to hear a death-penalty case. Nine months later, the Kentucky high court reinstated Judge Scott's ruling by a 4-3 vote. The judge had ample grounds to deduce that Bethlehem acted willfully, the majority wrote.

The steel giant's response? It sued each of the justices individually in federal court, asserting that John Doug Hays, a stand-in justice specially appointed for the case because another justice had a conflict of interest, had been wrongly designated. Its argument accused the court of violating language in the state's constitution on how vacancies on the bench were to be filled.

The U.S. District Court for Eastern Kentucky quickly threw out the complaint. Noting the case's "tortured history," the appeals panel ruled that case law dictated it not get involved if the litigation was still pending in state court. Bethlehem, the court said, still had an opportunity to raise its constitutional claims in Kentucky.

To keep the case alive, Bethlehem was now forced to go back to the state's highest judges — the same ones it had previously sued. The court heard Bethlehem's request for a rehearing in December 1993. Extreme skepticism emanated from the bench as Bethlehem appellate lawyer Lively Wilson quipped that perhaps he should have worn his "asbestos vest."

One Kentucky justice wasn't amused. "It's unheard of to wait until after a judge has ruled in a matter to object to his having sat in a matter," he said dryly.

## Another Blow

Almost a year had passed when, the day before last Thanksgiving, the Kentucky court again squelched Bethlehem's arguments, this time by a 6-1 margin. With interest and penalties, Bethlehem now owed nearly $37.6 million.

Bethlehem immediately moved to stay the award. No dice, said the court. The company hired the firm of former Attorney General Benjamin Civiletti — a Bethlehem board member — to make the same plea to the U.S. Supreme Court, but it also refused.

Beyond the Johnson children — including an illegitimate daughter of John Johnson who stepped forward after the damages ruling — various people connected with Church & Mullins have received large sums. Mr. Davis, who also happens to represent Paula Jones in a sexual harassment suit against President Clinton, has been rewarded handsomely, too. He took the case on contingency, and also holds a stake in Church & Mullins.

Bethlehem, in its appeal to the Supreme Court, asserts that the Kentucky court deprived it of due process when it allowed Special Justice Hays to sit in on the case. Though it no longer disputes that the property and coal in question belonged to Mr. Johnson, the company hopes a favorable decision by the Supreme Court would negate the Kentucky court's determination of willful trespass, and thus significantly lower damages.

Mr. Johnson wasn't the only participant to pass away in the course of the saga. So did several attorneys for both sides. Walter Mullins died of a stroke about a week before last fall's ruling. Warren Wright, another litigant, breathed his last a few months earlier. Even one of Mr. Johnson's children, Ben, died of heart trouble before the case was over; his share went to his wife and children.

Mr. Johnson's eldest son, known as Three-Mile Charley, 82, still resides in Pikeville. Claude left home in 1963 to follow two older brothers to Michigan and work for Ford Motor Co. — a path taken by many in the area when the booming auto industry promised jobs that were all too scarce back home. A tool-and-die maker for 31 years, he made some good investments and just retired to Florida.

His sister Mrs. Thornbury, however, has been living in a run-down trailer along Three-Mile Creek, just yards from the site of the house, now gone, where they all grew up. She has a part-time cafeteria job in a local school. "It's all unbelievable, I guess," mused Claude Johnson. Adds Herman Lester, another Church & Mullins lawyer: "In some small way, we feel like we've tipped the scales a bit."

Pike County, meanwhile, is still the site of more underground bituminous mining than any other county in the nation. But area leaders are looking for tourist dollars with their annual Hillbilly Days festival and some Hatfield-McCoy landmarks. And a local share of a coal severance tax is dedicated to incentives to lure new industries like a cookie factory that moved in a few years ago.

Bethlehem Steel, meanwhile, stopped mining coal in the area in 1988. It also probably learned a lesson about local character. "Bethlehem's attitude was, 'They're just a bunch of dumb hillbillies,' " says Larry Baker, president of a company that now owns Church & Mullins.