**In re BLUE COAL CORPORATION, Bankrupt.**

**In re GLEN NAN, INC., Bankrupt.**

**Bankruptcy Nos. 76–1311, 78–604.**

United States Bankruptcy Court, M.D. Pennsylvania.

Jan. 15, 1997.

John H. Doran, Wilkes–Barre, PA, for Trustee.

William H. Schorling, Pittsburgh, PA, for Trustee, Frank M. McDonnell.

## OPINION AND ORDER

JOHN J. THOMAS, Bankruptcy Judge.

But for the efforts of Attorney John Doran in placing the Blue Coal Corporation into involuntary bankruptcy, it would have been extremely unlikely that the prepetition creditors of that company would have ever seen a dime of payment. Now, the secured and priority creditors are being paid in full, and the non-priority creditors will receive approximately sixty cents on the dollar (albeit sixty 1997 cents on the individual 1976 dollar, an observation that considerably diminishes the obvious "success" of the bankruptcy).

The court makes this finding in response to the pending request of Attorney Doran and his law firm, Doran and Nowalis, for a $250,000.00 bonus for the work that they performed as former counsel to the Trustee in this case.

Initially, Doran and Nowalis filed a Final Fee and Expense Application seeking to recover $535,318.31 and expense reimbursement of $5,393.40 as well as a bonus request of $500,000.00. Together with approval of earlier allowances of $922,351.69, their total request for fees was $1,457,670. This covered services performed as counsel to the Trustee from August 31, 1977 to October 2, 1993, the date of counsel's discharge. On May 24, 1995 a supplemental application was filed for time spent pursuing legal fees *after* the Trustee fired them, in the amount of $88,718.00, later reduced because of a mathematical error to $78,006.25, together with costs of $458.75.

Hearings were held on Objections to the fee application over the course of thirteen days. While the case was under advisement, the litigants resolved their differences by consenting to an award of $425,000.00 additional compensation to Doran and Nowalis and Doran and Nowalis agreeing to limit their bonus request to an additional sum of $250,000.00.

In support of the original bonus request, Doran and Nowalis advanced these reasons. "Because of the extraordinary results received as a result of their efforts, the risk that was taken initially to perform these services, the uniqueness of the result achieved in Gleneagles and in other litigation described throughout the Application, it is believed Doran and Nowalis are entitled to a fee bonus of Five Hundred Thousand Dollars ($500,000.00) for which request is made."

(Application of Doran and Nowalis for Compensation of Professional Services Rendered and for Reimbursement of Expenses Incurred for the Period August 31, 1977 Through October , 1994[sic], filed November 22, 1994.)

With regard to the post-settlement bonus request of $250,000.00, Doran and Nowalis further argued that their work was of superior quality, the success was exceptional, enormous time was involved, and the issues were novel and difficult. (Application of Doran and Nowalis for an Allowance of Bonus Compensation filed November 15, 1996.)

█ Notably, the bonus request has been opposed only by the Trustee. All major creditors, and all but one minor creditor, have chosen not to object to the request even though the payment of same will reduce, dollar-for-dollar, the distribution to unsecured, non-priority creditors. Nonetheless, the court has a duty to review and limit fee allowances to a reasonable amount. "[A]n attorney's fee award should be only as large as necessary to attract competent counsel." *Lewis v. Coughlin,* 801 F.2d 570, 576 (2nd Cir.1986). (Even though a civil rights case, the principle is equally applicable in bankruptcy.) Our obligation to perform this task arises from an inherent responsibility to supervise the proceedings and to guard against a squandering of the estate. *In re Busy Beaver Bldg. Ctrs.,* 19 F.3d 833, 841 (3d Cir.1994). This is especially true under the Bankruptcy Act of 1898 wherein Congress has observed that the "system operates more for the benefit of attorneys than for the benefit of creditors." H.R. No. 595, 95th Cong., 2d Sess. 92, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6053. These dangers lurk all the more formidably where, as here, the avoidance of the major liens has created a "cash cow" of enormous proportions, and the lapse of time from the stripping of the liens to the liquidation of the property was nothing short of epochal.

█ "The burden of proving that such an adjustment is necessary to the determination of a reasonable fee is on the fee applicant." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983).

In considering whether a professional should receive a bonus,[1] various criteria have been enunciated by the courts including the following.

(1) An outstanding result for creditors, *In re Southern Merchandise Distributors, Inc.,* 117 B.R. 725 (Bankr.S.D.Fla.1990);

(2) An extraordinary effort, *In re Aminex Corp.,* 15 B.R. 356, 364 (Bankr.S.D.N.Y. 1981);

(3) The full payment of all creditors, *In re D.W.G.K. Restaurants,* 106 B.R. 194, 197 (Bankr.S.D.Cal.1989);

(4) The expedience with which the professional performed its duties, *In re Summit Communities of Florida, Inc.,* 84 B.R. 863, 871 (Bankr.S.D.Fla.1988);

(5) The difficulty in finding counsel in the local or other relevant market, *Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987);

(6) The delay in receiving fees from the time the services were performed, *In re White Motor Credit Corp.,* 50 B.R. 885 (Bankr.N.D.Ohio 1985);

(7) The initial risk or contingency of non-payment of any legal fees, *In re Southern Merchandise Distributors, Inc.,* 117 B.R. 725, 728 (Bankr.S.D.Fla.1990);

(8) The existence of factors not initially considered in calculating the professional's standard fee, *In re White Motor Credit Corp.,* 50 B.R. 885, 889 (Bankr.N.D.Ohio 1985);

---

1. The term "bonus" is only one of a number of terms used to identify extra compensation over that provided for under the original terms of employment. Other terms used are enhancement, *In re Penn–Dixie Industries, Inc.,* 18 B.R. 834, 836 (Bankr.S.D.N.Y.1982); premium, *In re White Motor Credit Corp.,* 50 B.R. 885 (B.R.N.D.Ohio 1985); upward adjustment, *In re Southern Merchandise Distributors, Inc.,* 117 B.R. 725, 728 (Bankr.S.D.Fla.1990); reward, *In re Penn–Dixie Industries, Inc.,* 18 B.R. 834, 836 (Bankr.S.D.N.Y.1982); and augmentation, Report of the Third Circuit Task Force, Court Awarded Attorney's Fees (Oct. 8, 1985), reprinted in 108 F.R.D. 237, 263 (1985).

(9) The nunc pro tunc adjustment of original retention orders to avoid inequity, *In re Churchfield Management & Invest. Corp.*, 98 B.R. 838, 854 (Bankr.N.D.Ill.1989);

(10) The ratio of the bonus request to the time spent, *In re Penn–Dixie Industries, Inc.*, 18 B.R. 834, 837 (Bankr.S.D.N.Y.1982); and

(11) Whether the entire legal fee, including the bonus, appears to be excessive as that term is used in the American Bar Association Model Code of Professional Responsibility, Disciplinary Rule 2–106(B). *In re Southern Merchandise Distributors, Inc.*, 117 B.R. 725 (Bankr.S.D.Fla.1990).

### OUTSTANDING RESULT

Our lead paragraph specifies the impact that Doran has had on this case.

Some background is necessary. John Doran is not a novice in the bankruptcy arena. For many years, even predating the inception of this case, he was reputed to be the area's premier bankruptcy lawyer. His hourly rates reflected that regard. When he first undertook this position as counsel to the Trustee, virtually all of Blue Coal's real estate assets, approximately 17,000 acres, were scheduled for tax sale by Luzerne County, presumably to be purchased by the major lienholder, McClellan Realty Company. The involuntary bankruptcy filing, engineered by Doran, stopped that sale and gave to the Trustee, as well as the United States and Commonwealth of Pennsylvania taxing authorities, an opportunity to litigate the validity of certain liens against the property. While the litigation was likely the brainchild of Attorney Doran, the comparative depth of assets and person power of the United States made the government the likely lead counsel to pursue this enormously successful litigation to its conclusion. Further detail on that lawsuit can be located by reference to those reported District court cases. *United States v. Gleneagles Inv. Co.*, 584 F.Supp. 671 (M.D.Pa.1984); *United States v. Gleneagles Inv. Co.*, 571 F.Supp. 935 (M.D.Pa.1983);

*United States v. Gleneagles Inv. Co.*, 565 F.Supp. 556 (M.D.Pa.1983), *aff'd in part and vacated in part sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied sub nom. McClellan Realty Co. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987).

Suffice it to say that *Gleneagles*, the popular name by which these trilogy of cases are known, has become a landmark authority for "lender liability" litigation in the area of fraudulent conveyance. In summary, Doran's presence in this case has had enormous implications for the junior creditors leading this court to conclude that the results have been outstanding.

While other aspects of Doran's 16 years of representation have culminated in superior results, performance at that level is to be expected from a lawyer of Doran's stature.[2] Moreover, the Gleneagles litigation accounted for more than 25% of the total time accounted for in the Doran and Nowalis Application despite the fact that the last significant time entry regarding Gleneagles appears in 1987. Notwithstanding Doran and Nowalis' overall performance, it is dwarfed, both in time and results by the Gleneagles litigation.

### EXTRAORDINARY EFFORT

The term "extraordinary" is defined by Black's Law Dictionary as "exceeding the usual, average, or normal measure or degree." Black's Law Dictionary 586 (6th ed. 1996). Considering the fact that Doran and Nowalis has already been paid for time at its customary hourly rate, I view "extraordinary" to refer to an effort over that which one should normally expect of that firm.

■ In that regard, there is a strong presumption that the product of reasonable hours times reasonable rates represents a reasonable fee. This is called the "lodestar figure." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air I*, 478 U.S. 546, 561, 106 S.Ct. 3088, 3096, 92 L.Ed.2d 439

---

**2.** It should be noted that Attorney Doran's chief associate in representing the Trustee was Attorney Robert Nowalis, a well regarded bankruptcy lawyer who has been working with Doran from about the inception of the case. That Mr. Nowalis' hours account for the bulk of time the firm spent on the Gleneagles litigation takes away nothing from our ultimate conclusion.

(1986). The Third Circuit pioneered the lodestar analysis in *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir.1973) (Lindy I). The lodestar also represents "the most useful starting point for determining the amount of a reasonable fee." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).

The Final Fee Application illustrates that during the early years of representation, from 1977 to 1981, as many as 11 lawyers participated in providing services on behalf of the Trustee from the Doran office. At that point, Doran was part of a larger office and, even though the bulk of the work was done by three lawyers, a support staff was readily available. When Doran and Nowalis left to form their own smaller office, there was no indication that the demands on that new office could not have been anticipated.

At the time of hearing on the Fee Application, Doran acknowledged that his office "could not possibly have handled the breadth of discovery, financially or otherwise, at that time." (referring to the Gleneagles litigation). (Transcript of February 23, 1995 at 77.)

The Final Fee Application identifies over 12,000 hours of billable time that was virtually fully allowed by the terms of the final settlement.[3] While the efforts expended in this case were considerable, there is no reason to believe that the compensation previously awarded was insufficient.

### FULL PAYMENT TO CREDITORS

As mentioned earlier, unsecured, non-priority creditors will receive approximately 60% of their claims. This factor is important since they would necessarily suffer a diminution to the same degree to which a bonus is allowed. While no objection to the $250,-000.00 bonus request has been raised by any major creditor, allowing the request would reduce the distribution. Therefore, this criteria cannot support an enhancement. Nevertheless, the creditors acquiescence to the

bonus, however, is no small factor in this decision.

### EXPEDIENT PERFORMANCE

The lodestar figure is not without its disadvantages. As pointed out by the Third Circuit Task Force,

Lindy [lodestar formula] creates a disincentive for the early settlement of cases. Because of Lindy's emphasis on hours worked, lawyers—including defense counsel who typically bill their clients on an hourly basis—have little or no incentive to settle cases at the earliest appropriate opportunity. To the contrary, there appears to be a conscious, or perhaps unconscious, desire to keep the litigation alive despite a reasonable prospect of settlement, to maximize the number of hours to be included in computing the lodestar. Report of the Third Circuit Task Force, Court Awarded Attorney's Fees (Oct. 8, 1985), reprinted in 108 F.R.D. 237, 248 (1985).

As the parties are aware, this court has been critical of the failure of the Trustee to act in an expeditious fashion in liquidating the assets of the estate. *In re Blue Coal Corp.*, 168 B.R. 553, 567 (Bankr.M.D.Pa. 1994). To a significant degree, counsel is responsible for that perceived failure, (*In re Consupak, Inc.*, 87 B.R. 529 (Bankr.N.D.Ill. 1988)), especially in this case where the Trustee was so dependent upon counsel both on legal matters as well as for counsel's broad background of the case.

Expedience is not a factor in the lodestar calculation and, therefore, is grounds for an upward adjustment. I cannot find that such expedience was present in this case, purportedly the longest running bankruptcy case in the nation.

### DIFFICULTY IN FINDING COUNSEL

No direct evidence was offered as to the difficulty of securing counsel at the outset of this case. Nevertheless, the court has received evidence of such circumstances that would allow me to conclude that securing and

---

**3.** The total request sought total fees of $1,535,-676.25. The settlement allowed $1,347,351.69 or approximately 88% of the request. Over $78,-

000.00 of the request sought compensation for services in pursuing their fees after the Trustee discharged them.

retaining counsel to represent the Receiver and then the Trustee may not have been an easy task.

Initially, the estate had little or no money as indicated by the reports on record in this case. All of the estates' significant assets were fully encumbered by seemingly valid liens. The lienholders were well able to fund a defense to any legal attack. (Transcript of February 21, 1995 at 55.) Doran testified that he had some concerns for his safety, implying that the entities being investigated in furtherance of the lien avoidance and the recovery of the fraudulent conveyance would not limit themselves to legal defenses. (Transcript of February 21, 1995 at 65–66.) This perceived threat was not entirely unsupported in that the famous James "Jimmy" Hoffa proved to be an investor in the Blue Coal property, through a straw party, before his unexplained disappearance. Indeed, the questionable background that surrounded the Blue Coal principals was the subject of a Pulitzer Prize winning series of articles in the Pottsville Republican, a Schuylkill County newspaper. (Transcript of February 21, 1995 at 66.)

I am satisfied that the record is sufficient to conclude that securing counsel during the early stages of this case would have been most difficult.

### THE DELAY IN RECEIVING FEES

The court's review of earlier fee applications of the Doran firm indicate that certain Objections were resolved by agreement of the parties which included a provision that future fee agreements could include a demand for "interest" on holdback requests. (See, for example, Order Approving the Stipulation between Doran and Nowalis and the United States of America, dated January 16, 1986.) This Stipulation was approved, in spite of authority that interest per se is not an appropriate component of a fee. *In re White Motor Credit Corp.*, 50 B.R. 885, 889 (Bankr.N.D.Ohio 1985). Orders of that nature suggest to this court that an enhancement of some sort, whether it is called interest or bonus, was contemplated by all parties

in this case, including my predecessor, the Honorable Thomas C. Gibbons.

Furthermore, a comparison of the attorney's fee applications and the Trustee's accounts on record suggest that full compensation of counsel at the time when services were provided would have rendered the estate monetarily insolvent or so "cash poor" as to prevent an effective administration. Some delay in payment of counsel fees was apparently necessary.

### RISK OF NONPAYMENT

The risk or "contingency" of nonpayment has been said to warrant an upward adjustment over the lodestar amount. *In re Southern Merchandise Distributors, Inc.*, 117 B.R. 725, 728 (Bankr.S.D.Fla.1990).

> Despite the confusion in the case law, it should be noted that contingent adjustments are not the same as a contingency fee arrangement. Contingency fee arrangements ... are arrangements where an attorney's fee is based on a percentage of the amount recovered by his client. Contingency adjustments ... are a percentage increase over and above the amount obtained by multiplying hours expended by hourly rate; arrangements which call for contingency adjustments are specifically designed to reflect the risk that no fee may be obtained. *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1213 (9th Cir.1986).

Nevertheless, our Supreme Court has discounted the risk of nonpayment as a factor in the enhancement of attorney's fees. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 725, 107 S.Ct. 3078, 3086, 97 L.Ed.2d 585 (1987). It appears, however, that this position may be limited to "fee-shifting" [4] cases which contemplates that the unsuccessful litigant would bear the expense of paying the successful party's legal fees. This is distinguished from the "American rule" where each litigant bears their own legal expenses.

Fee-shifting cases typically are spawned from statutes where a legislatively recog-

---

4. Sometimes referred to as "statutory fee" cases. Report of the Third Circuit Task Force, Court

Awarded Attorney's Fees (Oct. 8, 1985), reprinted in 108 F.R.D. 237, 250 (1985).

nized right is being enforced through litigation against a purported violator. The most obvious examples lie in enforcement of civil rights, environmental protection, and antitrust. In these cases, it is fair that the losing party bear the expense of the litigation. It is likewise appropriate that litigations to enforce these rights should be encouraged. Nevertheless, it would be manifestly ridiculous to compel a losing party to pay an enhancement of a standard legal fee to the winning plaintiff where the plaintiff has overcome great odds of securing a verdict since this is exactly the same case where the defendant was more likely to have been thought to be within its rights. "[P]enalizing defendants with strong cases is a notion completely foreign to bankruptcy." *In re Farah,* 141 B.R. 920, 923–24 (Bankr.W.D.Tex.1992).

Statutory fee-shifting provisions reflect the intent of Congress "to encourage private enforcement of the statutory substantive rights, be they economic or non-economic, through the judicial process." *Skelton v. General Motors Corp.,* 860 F.2d 250, 255 n. 5 (7th Cir.1988), *cert. denied sub nom. General Motors Corp. v. Skelton,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989); *citing* Report of the Third Circuit Task Force, Court Awarded Attorney's Fees (Oct. 8, 1985), reprinted in 108 F.R.D. 237 (1985).

It is important to distinguish between common-fund cases [5] and fee-shifting cases. *In re Churchfield Management & Inv. Corp.,* 98 B.R. 838 (Bankr.N.D.Ill.1989).

■ The common-fund doctrine
allows a person who maintains a lawsuit that results in the creation, preservation, or increase of a fund in which others have a common interest, to be reimbursed from that fund for litigation expenses incurred....

. . . .

The purpose of the "equitable-fund," "common-fund," or "fund-in-court" doctrine, . . . is to avoid the unjust enrichment of those who benefit from the fund that is created, protected, or increased by the litigation and who otherwise would bear none of the litigation costs. The rule also derives from the common-law concept that a trustee who is under a duty to act for others is entitled to be reimbursed from that fund for expenses incurred in administering the trust. Report of the Third Circuit Task Force, Court Awarded Attorney's Fees (Oct. 8, 1985), reprinted in 108 F.R.D. 237, 241–250 (1985).

This should be contrasted with the fee-shifting case where it is fair that the losing party bear the expense of plaintiff's litigation.

While bankruptcy cases have been viewed as having some similarity with fee-shifting cases,[6] our circuit has recognized features common to the standards applicable in bankruptcy cases and common fund cases, and has discounted such a parallel with fee-shifting cases. *In re Busy Beaver Bldg. Ctrs.,* 19 F.3d 833, 841–842 (3d Cir.1994). In accord *In re Farah,* 141 B.R. 920, 927 (Bankr. W.D.Tex.1992). Nevertheless, this court is of the opinion that enhancements for bankruptcy representation is likely to require considerations of factors utilized in both common fund and fee-shifting cases. This is so because bankruptcy is not a one-dimensional contest between litigants. Rather, it carries all the variables and complexities that might be present in counseling any economic unit. This is true whether the bankrupt be business or individual, operating or liquidating. A lawyer may be called upon to advise a trustee, or debtor, regarding duties to the estate, while pursuing the whereabouts of assets, investigating bankruptcy crimes, or preparing estate accounts. This may all occur simultaneously with various preference and fraudulent conveyance litigation.

In short, different considerations must influence individual facets of the representation. In this case, there was no significant estate until Doran conceived the attack on

---

**5.** Also known as "equitable-fund" or "fund-in-court" cases. Report of the Third Circuit Task Force, Court Awarded Attorney's Fees (Oct. 8, 1985), reprinted in 108 F.R.D. 237, 250 (1985).

**6.** See, for example *In re Churchfield Management & Inv. Corp.,* 98 B.R. 838, 842 (Bankr.N.D.Ill. 1989).

the lien and the fraudulent conveyance. Doran accepted the possibility of his nonpayment until that attack proved to be fruitful. Once a fund was generated, it would appear only appropriate that the beneficiaries of that fund bear the expense associated with that attack. In this way, at least a portion of the services provided by Doran and Nowalis and its predecessor should be treated as if it were a common fund case.

Through 1983, funds received by the estate could barely have been marshaled to pay administrative expenses had demands been made by the administrative creditors. See the various financial reports on file. Despite this lack of funds, the services demanded of Doran and Nowalis were probably the most intensive at this time.

Attorneys' fees were significantly at risk.

I am satisfied that the contingency factor favors an enhancement.

### THE EXISTENCE OF FACTORS NOT ORIGINALLY CONSIDERED

While the course of this case from its original filing could never have been predicted, the only relevant fact that could not have been reasonably anticipated by either the court or counsel at the inception of this case was its longevity. Since a good part of that pendency was by choice of the Trustee and their counsel with the acquiescence of the creditors, this cannot be a factor favoring enhancement.

### AVOIDANCE OF INEQUITY IN THE ORIGINAL RETENTION

The Trustee's original application to hire Doran requested that Doran be employed on a "general retainer." (Application filed October 21, 1977.) In the Wilkes–Barre Division of the Middle District, that has historically meant that counsel would seek compensation for time spent at the prevailing hourly rate. This understanding of all interested parties, including the Trustee, counsel, the court, and the creditors, was entirely consistent with

the prevailing philosophy that the lodestar approach was a fair measure of compensation.

John Doran, and the firms with which he was associated, have received total compensation from the estate of $1,347,351.69 in payment for 12,538.9 hours of work performed on behalf of the Trustees by various individuals at differing rates. This represents an average hourly rate of $107.00 per hour over the course of their representation from 1977 to 1993. While the final allowance, but for the bonus, was an agreed upon amount between the parties, the court is satisfied that the lodestar provided the range upon which that agreement was reached. I can find no inequity caused by the original agreement.

### RATIO OF THE BONUS REQUEST TO TIME SPENT

As was pointed out, Doran and Nowalis are seeking a $250,000.00 bonus for 12,538.9 hours of work. The mathematics compute to a modest $20.00 per hour. If enhancement is justified, the request is within a reasonable range.

### EXCESSIVENESS OF ENTIRE FEE, INCLUDING BONUS

Former Disciplinary Rule 2–106(B) recites that "[a] fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." [7]

When the bonus request is added to the previous allowance of $1,347,351.69, the entire fee would total $1,597,351.69 in payment of 12,538.9 hours of service. The Anthracite Health and Welfare Fund, as a secured creditor, has received $3,700,000.00. The priority prepetition creditors have received or will receive approximately $1,800,000. The prepetition unsecured creditors are projected to receive approximately $3,800,000 should the

---

7. The Rules of Professional Conduct have superseded the Code of Professional Responsibility as of April 1, 1988. Because the Disciplinary Rules were an interrelated part of the Code, the "excessiveness" language has been eliminated. See the

Preliminary Statement to the Code of Professional Responsibility reported in 42 Pa.C.S.A. Nevertheless, I find that this inquiry retains its usefulness in the context of this issue.

bonus be allowed. Those figures represent an $9,300,000 distribution to a creditor body whose prepetition expectancy was nil. I cannot conclude that such an allowance is unreasonable.

■ In summary, many of the 11 factors the court has reviewed, favor the award of a bonus. They stand as persuasive reasons why the Application of Doran and Nowalis should be approved. The bonus request is therefore allowed, although the amount of that bonus must now be considered.

■ In quantifying an enhancement, the courts have been advised, at least in the more conservative fee-shifting cases, to limit the amount to one-third of the lodestar figure. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 729, 107 S.Ct. 3078, 3089, 97 L.Ed.2d 585 (1987).

An alternate method of calculating an enhancement is by using a percentage of the benefit analysis. Nevertheless, the clear trend has emerged that would base any enhancement on the "time-rate." *In re Churchfield Management & Investment Corp.*, 98 B.R. 838, 848 (Bankr.N.D.Ill.1989). This procedure is known as the "multiplier" approach and begins with the lodestar which is adjusted by an appropriate factor. This approach is favored by the Third Circuit where multipliers range from a negative to four or more. Report of the Third Circuit Task Force, Court Awarded Attorney's Fees (Oct. 8, 1985), reprinted in 108 F.R.D. 237, 263 (1985).

Doran and Nowalis are seeking a bonus that approximates 18–19% of their lodestar allowance. As is apparent in this opinion, the court considers the period of representation most favoring an enhancement to be the initial years of the case when the efforts were great and the prospects of success were particularly glum. It is here where the court will reward the efforts of Doran and Nowalis in freeing the assets from the lien and the fraudulent transfer to the direct benefit of the junior creditors.

In particular, there is one segment of representation where the court finds that the lodestar did not compensate counsel for the trustee for the full worth of their contributions and the factors suggesting an enhancement are most compelling. That segment is identified by reference to counsel's initial fee application as counsel to the Receiver, Charles A. Shea, filed March 24, 1980, and covering a period from March 11, 1977 to August 31, 1977 and Doran's subsequent fee application on behalf of Trustee Haggerty, filed May 14, 1981. That application covered a period from August 31, 1977 to May 14, 1981. It was during this time that Doran, having placed Blue Coal into bankruptcy, initiated his investigation which culminated in the original bankruptcy litigation by the Trustee against the Clevelands and McClellan Realty in 1978–79. As a practical matter, the issues raised in those litigations were pursued by Complaints filed in District Court in 1980 by the United States, the Commonwealth, and the Trustee, the results of which are now part of the storied history of this case.

It was also during that stage that Doran's efforts were most at risk of not being compensated. Similar to fee-shifting cases, there is also a public policy argument why lawyers should be encouraged to undertake such litigations, but unlike the typical fee-shifting case, the enhancement need not be borne by the losing party, rather by the beneficiaries of the fund.

I conclude that doubling the allowance for that time spent by Attorneys Doran and Nowalis on the initial phase of this case up to the point when the government shouldered the burden of Gleneagles, is justified. While the presence at trial of Attorneys Doran and/or Nowalis were valuable, their role was secondary to that of lead counsel, Attorney Beth Kaswan representing the United States. A multiplier of two is a legitimate vehicle to calculate enhancements in common fund type cases under circumstances as we have here. *In re Mullins*, 187 B.R. 523 (Bankr.W.D.Va.1995). "[D]oubling the fee is an appropriate enhancement that appropriately recognizes the extraordinary contribution of counsel to the success of this case, while remaining faithful to the public's interest in discouraging professionals from suc-

cumbing to excessive greed." *In re Farah*, 141 B.R. 920, 929 (Bankr.W.D.Tex.1992).

While I am tempted to allow such multiplier to reflect the last billed hourly rates so as to adjust for the delay in distribution,[8] to do such would reward counsel for their inability to conclude the case sooner.

I therefore allow the bonus request in such amount as the hours expended by Attorneys Doran and Nowalis multiplied by their then-prevailing hourly rate from March 11, 1977 through December 12, 1980, the date that the United States undertook the District Court litigation eventually voiding the McClellan mortgages. In reviewing the records before me, I can estimate the time spent representing the Trustees prior to January 1, 1981, as approximating 1,500 hours. (See paragraph 7 of Application of Doran & Nowalis for an Interim Allowance filed March 7, 1984.) I will multiply those hours by John Doran's then prevailing hourly rate of $70.00 indicated in his Work in Process Report attached as Exhibit E to the Final Fee and Expense Application filed November 22, 1994 to arrive at a figure of $105,000.00. In arriving at a final bonus allowance, I will double the final fee allowance for the Applicant's work on behalf of the original Receiver, Charles A. Shea, Jr. as indicated by his Application filed on March 24, 1980. For those services from March 11, 1977 to August 31, 1977, Attorney Doran received $12,500.00. The court deems it appropriate to supplement the $105,000.00 figure by this amount to accurately reflect the importance with which we view the events of this time period.

---

8. See Report of the Third Circuit Task Force, Court Awarded Attorney's Fees (Oct. 8, 1985), reprinted in 108 F.R.D. 237, 265 (1985).